EDWIN PRATHER, CABN 190536
PRATHER LAW OFFICES
245 Fifth Street, Suite 103
San Francisco, CA 94103
Telephone: 415.881.7774
Email: edwin@pratherlawoffices.com

Attorneys for Defendant
KEVIN ALAN MURRAY

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KEVIN ALAN MURRAY,<br><br>Defendant. | Case No.:  CR 17-0509 CRB<br><br>**DEFENDANT KEVIN ALAN MURRAY'S SENTENCING MEMORANDUM AND REQUEST FOR A DOWNWARD VARIANCE**<br><br>Hearing Date: December 16, 2020<br>Hearing Time: 10:00 a.m.<br>Judge: The Honorable Charles R. Breyer |

## I. INTRODUCTION

Defendant KEVIN ALAN MURRAY (hereinafter referred to as "Mr. Murray" or "Kevin") stands before the Court having pled guilty to one count – robbery, on lands administered by the Presidio Trust, in violation of 18 U.S.C. § 2111. For the reasons indicated herein, the Court should sentence Mr. Murray to one year of probation. Such a sentence is an appropriate resolution to punish Mr. Murray for his actions, but also to consider his personal issues under 18 U.S.C. § 3553(a). This sentence meets the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence, and to protect the public from further crimes.

## II. STATEMENT OF FACTS

On March 2, 2017, Mr. Murray went to the Park Presidio to commit an automobile burglary. After viewing a large digital camera on the front passenger seat of a silver minivan, Mr. Murray broke into the vehicle to take the camera. *See* Presentence Report ("PSR"), ¶¶ 9-10, 16. A colleague of the owner of the camera was asleep in the backseat and awoke during Mr. Murray's taking of the camera and subsequent exit from the minivan. *Id.,* ¶ 9-10. From the backseat, the friend attempted to secure the camera, but was unable to do so. *Id.* Mr. Murray ran away with the camera and fled the area in an automobile. *Id.* Two days later, after a law enforcement investigation, Mr. Murray was arrested and placed in the custody of the U.S. Park Police on March 4, 2017. *Id.,* ¶ 13.

## III. PROCEDURAL HISTORY

On September 21, 2017, a one-count indictment was filed by the government against Mr. Murray charging him with a violation of 18 U.S.C. § 2111 -- robbery, on lands administered by the Presidio Trust. *Id.,* ¶ 1. On October 19, 2017, Mr. Murray was arrested by the U.S. Park Police on the

1
2
Indictment.  PSR, ¶ 4.  On October 20, 2017, Mr. Murray made his initial appearance before the Court and was detained at that time.  *Id.*

3
4
5
6
7
8
9
One week later, on October 27, 2017, Magistrate Judge Jacqueline S. Corley placed Mr. Murray on pretrial release, with terms and conditions of release, including, *inter alia,* that he reside at a halfway house in San Francisco, California.  *Id.*  Approximately five months later, on March 23, 2018, Mr. Murray was remanded back into custody for fighting with another halfway house resident.  *Id.,* ¶ 5.  Mr. Murray was remanded to custody again to reflect on his actions and his anger management.  After spending another four weeks in custody, Magistrate Judge Corley released Mr. Murray to a different halfway house, this time in Oakland, California.  *Id.*

10
11
12
13
14
15
After performing well at the Oakland halfway house for approximately eight months, Magistrate Judge Corley released Mr. Murray to the custody of his mother on November 19, 2018.  *Id.,* ¶¶ 5-7.  Since that time, Mr. Murray has performed well on pretrial release including being compliant with his curfew, maintaining employment, staying out of trouble, and working on his anger management and mental health issues through therapy and counseling.  *See id.,* ¶ 7.

16
17
18
On January 31, 2019, Mr. Murray pled open to the Court to the sole count in the Indictment without the benefit of a plea agreement.   This Court is scheduled to impose its sentence in this case on December 16, 2020, at 10:00 a.m.

19
**IV. THE PRESENTENCE INVESTIGATION REPORT**

20
21
All objections and edits to the Presentence Investigation Report have been addressed with the U.S. Probation Department.  Mr. Murray has no remaining objections or suggested edits to the PSR.

22
**V. SENTENCING GUIDELINES CALCULATION**

23
24
25
Pursuant to the United States Sentencing Guidelines ("U.S.S.G."), which are advisory after the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), Mr. Murray has a total

1

offense level of eighteen for his offense.  PSR, ¶ 30.  This total offense level is reached by starting with

2

a base offense level of twenty that is increased by one level based on the amount of loss – the value of

3

the digital camera.  *See* U.S.S.G. §§ 2B3.1(a) and 2B3.1(a)(7); PSR, ¶¶ 21-22.  Mr. Murray's adjusted

4

offense level of twenty-one is then decreased by three levels for his acceptance of responsibility

5

resulting in a total offense level of twenty-nine.  U.S.S.G. §§ 3E1.1(a) and (b); PSR, at ¶¶ 28-29.

6

Mr. Murray's criminal history score is three and his criminal history category is II.  PSR, ¶¶ 33-

7

45.

8

Therefore, Mr. Murray's adjusted offense level of twenty-one indexed with a Criminal History

9

Category II yields an advisory guideline range of 30 to 37 months.

10

## VI. SENTENCING RECOMMENDATION

11

12

Although the U.S. Probation Department is recommending no custody time and instead a five-

13

term probation term for Mr. Murray, Mr. Murray submits that a sentence comprised of one-year of

14

probation, reflecting a variance from the Sentencing Guidelines, is an appropriate resolution to his case.

15

Such a sentence is sufficient and not greater than necessary to comply with the directives of 18 U.S.C.

16

§ 3553(a).  The nature and circumstances of the offense and Mr. Murray's history and characteristics,

17

the need for the sentence imposed to reflect the seriousness of the offense and to afford adequate

18

deterrence, and the need to avoid unwarranted sentence disparities with those with similar conduct, all

19

militate in favor of a one-year probationary sentence.

20

### A.  The Nature and Circumstances of the Offense, as well as Mr. Murray's History and Characteristics, Support the Recommended Sentence

21

22

Under 18 U.S.C. § 3553(a)(1), "the court, in determining the particular sentence to be imposed,

23

shall consider the nature and circumstances of the offense and the history and characteristics of the

24

defendant."  These two factors support Mr. Murray's sentencing position.

25

Defendant Kevin Alan Murray's Sentencing Memorandum and Request for a Downward Variance
[Case No.: CR 17-0509 CRB]

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### 1. Nature and Circumstances of the Offense

While the facts in this case appear to be simple, the actions of Mr. Murray on March 2, 2017, do warrant discussion and explanation. On that day in March 2017, as noted in the police report, Mr. Murray was reconnoitering the Park Presidio parking lot in order to conduct a "smash-and-grab" – a car burglary. Mr. Murray identified that a digital camera was placed in the front seat of a minivan and that he would steal the camera by breaking the window of the minivan and grabbing it. However, Mr. Murray had no idea that someone was sleeping in the back of the van. He was certainly surprised when a previously sleeping individual appeared from the back of the van to grab at the camera.

This discussion is not relevant to whether a robbery was committed; it was, and Mr. Murray has pled guilty to the charge and taken responsibility for his actions. *See U.S. v. Parnell,* 818 F.3d 974, 978 (9th Cir. 2016) (noting that a robbery includes the taking of property from the presence of an individual and that "the degree of force is immaterial so long as it is sufficient to obtain the victim's property against his will" (citation and internal quotations omitted)). However, Mr. Murray's actions are different based on the amount of force he did NOT use in committing his crime.

Mr. Murray did not intend to making contact or even involving another individual when he broke into the minivan. Mr. Murray did not punch or hit the individual or brandish any kind of weapon. Mr. Murray did not slap or push the individual's hands away. Mr. Murray did not grab the individual. The individual sprung from the back of the van towards the camera and towards Mr. Murray, in an attempt to stop the burglary in progress. Mr. Murray did not make contact with the individual at all. *Mr. Murray was just as scared of the individual as the individual was of him.*

The actions in the present case lack violence and premeditation. Based on the facts of the present case, where an intended auto burglary turned into an unintended robbery, the nature and characteristics of the offense militate in favor of variance to a probationary sentence of one-year for Mr. Murray.

### 2.  Mr. Murray's History and Characteristics

#### a.  Background

In 1994, Kevin Alan Murray was born in San Francisco to Kevin Murray, Sr. and Dejuana Johnson.  Kevin was raised in the Bayview-Hunters Point area of San Francisco.  As the Court is likely aware, the Bayview-Hunters Point is known for, certainly during the 90's and early 2000's, its housing projects for low-income African American residents and its isolation from the rest of the city.  During these years, the median age of residents was under twenty and there were sparse, if any, recreation facilities.  Gang membership, criminal activity gripped scores of male African American youth.  Some parts of the neighborhood were largely abandoned and even others had been given over to drug dealing. This was the neighborhood that Kevin Murray was born into.  He was raised in a neighborhood with security bars on every window, garages always closed, sidewalks rarely swept, cars broken down and abandoned, and residents rarely on the street or outside.  To call Kevin's neighborhood hard-scrabble would be an understatement.

Growing up in difficult surroundings, Kevin's parents were strong advocates in Kevin's life. They were able to keep Kevin out of trouble, out of gangs, and out of criminal activity.  Even though there were few opportunities for organized sports in the area, Kevin's parents pushed him to seek out athletics to help keep him out of trouble.  Kevin found himself playing basketball daily and using that as his outlet.

Things would take a turn for the worst for Kevin at the age of eleven when his father was killed in the neighborhood.  His father's loss proved to be devastating to Kevin and he suffered physically and mentally during this time.  But through this hardship, Kevin's mother did not let her son fail.  She focused on raising him as a student-athlete and a fine young man.  It is impressive to note that Kevin's

mother, as a single mother, was able to keep Kevin away drugs and gangs.  Kevin became a remarkable high school basketball player earning city-wide and league honors and an opportunity to play in college.

Kevin graduated from high school and went across the Bay to study and play basketball at the College of Alameda.  For the first time, Kevin lived away from home and away from his mother while in student housing.  But after only one semester, it was clear that Kevin's mother could not afford Kevin's living expenses and Kevin was forced to move back home.

At home again, Kevin's dreams of a college education and college basketball were shattered and for the first time in his life, Kevin was lost.  *See* Declaration of Edwin Prather In Support of Defendant Kevin Alan Murray's Sentencing Memorandum and Request for a Downward Variance ("Prather Decl."), ¶ 2, Ex. A, January 15, 2019 Letter from Djuana D. Johnson ("Johnson Letter").  He was without basketball and without school, the two things that protected him from outside influences.  At first, Kevin found work and helped his mother with expenses, *i.e.,* rent, utilities, etc., and Kevin seemed to be making the best of a tough situation.  However, as a young adult "back in the neighborhood", Kevin, for the first time in his life, was unable to resist to siren's call of recreational drugs.  *See* Prather Decl., ¶ 2, Ex. A, Johnson Letter.  He started to use drugs such as marijuana and cough syrup with codeine.  His addiction to these gateway drugs led Kevin to discover auto burglaries as a way to "make a quick buck" to pay for Kevin's recreational drug use.  Kevin was arrested as a suspect in "smash and grab" auto burglaries and in 2016, he suffered his sole conviction, a misdemeanor conviction of a violation of California Penal Code § 459 (burglary) for which he received two years of informal court probation.  Prather Decl., ¶ 3.

Between 2015 and 2017, while Kevin was 20 to 23 years old, Kevin was clearly on his way to rock bottom.  The drug use and the criminal activity dragged Kevin down to where he never wanted to be.  He committed the instant offense, and then, to make matters worse, on March 14, 2018, Kevin

appeared on an outstanding warrant in San Francisco County Superior Court for similar conduct committed prior to the filing of the instant case.  Prather Decl., ¶ 3.

It was this instant case, however, that has served as the "wake-up call" Kevin needed.  Kevin was detained on two occasions as part of the pretrial process.  On the first occasion, Kevin spent one week in custody.  On the second occasion, Kevin was detained for approximately four weeks.  Kevin also spent five months in a San Francisco halfway house and seven months in an Oakland halfway house for a total of 12 months in halfway homes.  This maturation was not overnight for Kevin.  In fact, he had many issues while on pretrial release.  But through that process, Kevin was diagnosed with mental health and anger management issues and accepted group and individual counseling for those issues.  Even though Kevin graduated from his halfway house situation to living at home again with his mother, Kevin still attends weekly mental health sessions.

Kevin also became a father in September 2019.  Being a present, loving, supporting, and caring father is the hardest thing he has ever done. However, it has made him further realize his priorities and focus on his responsibilities.  He is focused on his job at Larkin Street Youth Services, counseling other troubled youth.  Larkin Street Youth Services continues to employ Kevin during the pandemic.

His criminal conduct is not indicative of Kevin's character or the person that Kevin is currently. Kevin has come a long way but he can still go further.  Kevin recognizes that he needs help, and desires to turn around his life for good.

### b.  San Francisco County Superior Court's Young Adult Court

Kevin was able to demonstrate the kind of turn around that most defendants are only able to give lip service to through his completion of the San Francisco Superior Court's Young Adult Court by virtue of Mr. Murray's pending case in state court.

The San Francisco Superior Court created Young Adult Court ("YAC") to be the first program of its kind nationally.  YAC's intent is to align opportunities for accountability and transformation with the unique needs and developmental stage of young adults.  YAC serves approximately sixty 18- to 24-year-old adults through a collaborative effort between the Court, District Attorney, Public Defender, Department of Public Health, Adult Probation Department, Department of Children, Youth and their Families, the San Francisco Police Department and various family service agencies.  *See* Prather Decl., ¶ 4, Exhibit B, San Francisco County Superior Court's Collaborative Court's Young Adult Court Fact Sheet; *see also* Prather Decl., ¶ 5, Exhibit C, San Francisco County Superior Court's Young Adult Court Participant Handbook; Prather Decl., ¶ 6, Exhibit D, May 2017 Evaluation of San Francisco County Superior Court's Young Adult Court, authored by Social Policy Research Associates; Prather Decl., ¶ 7, Exhibit E, June 29, 2018 San Francisco Chronicle article entitled "Graduating in a S.F. Courtroom – Program Propels Former Youthful Offenders," authored by Lauren Hernandez; Prather Decl., ¶ 8, Exhibit F, November 2, 2017 Boston Globe article entitled "18 year-old can barely rent cars.  Are they old enough for jail?," authored by David Scharfenberg.

Mr. Murray was admitted to YAC in April 2019.  While in YAC, Mr. Murray worked with YAC Treatment Team members "to create a Wellness Care Plan based on [his] individual needs and goals which may include housing, education, employment, financial benefits, mental and physical wellness, parenting and life skills support."  Prather Decl., ¶ 5, Exhibit C, San Francisco County Superior Court's Young Adult Court Participant Handbook, at p. 2.  Mr. Murray also adhered to a "Wellness Care Plan," a shared commitment between him, the Court and the other members of the YAC team.  *Id.*  For the first several months, Mr. Murray was required to attend *weekly court appearances*.  *Id.*  The Court and Mr. Murray's case manager tracked Mr. Murray's participation and progress through the phases, and watched over him every step of the way.  *Id.*  "From the beginning, Mr. Murray took the program

seriously and continue[d] to display commitment to completing all YAC requirements." Prather Decl., ¶ 9, Ex. G, August 23, 2019 Letter from Clinical Case Manager Jennifer Mejia. Mr. Murray participated in "weekly clinical case management, attend[ed] court hearings, and participat[ed] in [] weekly Dialectic Behavior Therapy (DBT) and Life Skills Group." *Id.* The Honorable Bruce Chan, San Francisco Superior Court Judge and Supervising Judge of YAC stated about Mr. Murray:

> During his time in YAC, he has been one of our most motivated clients. Kevin communicates well with his case manager and is always punctual and serious about program requirements. What is most impressive about his performance to date is that this has taken place while Kevin has struggled financially. His individualized treatment program consists of both one on one and groups counseling, vocational training, and continuing his education.

Prather Decl., ¶ 10, Ex. H, August 9, 2019 Letter from the Honorable Bruce Chan, San Francisco County Superior Court.

After his complete commitment for 18 months, Mr. Murray finally graduated from YAC on September 10, 2020. *See* Prather Decl., ¶ 11. The Court rewarded his successful participation and graduation from YAC, by having his state court charges dismissed and expunged. *Id.* By graduating from YAC, Mr. Murray left the state criminal justice system in a better position than when he entered. And while it was difficult to complete this onerous process, it will end up saving his life.

Should the Court impose the requested probationary sentence, Mr. Murray will be to return to his family and employment and continue all of the good works that he has been. Mr. Murray can make it. He will reward our faith in him. He is well-positioned to change his stars. A term of probation of one-year is enough to monitor him for a short period of time and then allow Mr. Murray to seek other opportunities to provide a better life of his family.

**B. A One-Year Probationary Sentence Meets the Directives of 18 U.S.C. § 3553(a)(2)**

18 U.S.C. § 3553(a)(2) directs the Court to consider "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense,

to afford adequate deterrence, and to protect the public from further crimes." A one-month probationary sentence meets these directives.

### 1. The Recommended Sentence Reflects the Seriousness of the Offense, Promotes Respect for the Law and Provides Just Punishment for the Offense

Mr. Murray's conduct in breaking into the minivan and taking a camera is serious and should not be minimized. Mr. Murray understands this and takes full responsibility for his actions. It is also clear that auto burglaries are an epidemic in San Francisco County and affect residents and tourists alike. In the first half of 2017, almost 18,000 vehicle break-in crimes occurred in San Francisco. *See* Eve Batey, "Massive Jump In San Francisco Car Break-Ins, As Thousands More Reported This Year Over Last", August 31, 2017, available at: https://sfist.com/2017/08/31/massive_jump_in_san_francisco_car_b/; *see also* Amy Hollyfield, "Proposal would reimburse car break-in victims for shattered windows", February 12, 2020, located at: https://abc7news.com/car-breakin-san-francisco-break-in-reimbursing-victims-break-in-reimbursement/5924918/#:~:text=We%20know%20that%20San%20Francisco,said%20District%20Attorney%20Chesa%20Boudin ("According to the DA's Office, between 2018-2019, there were approximately 17,819 auto burglary cases reported to SFPD by San Francisco residents."). Although the numbers of cases appear to be on the decline, San Francisco continues to warn tourists not to leave valuables in their cars because the City is aware that gangs and people work in concert to target rental vehicles.

San Francisco County's solution to automobile crimes has not been to incarcerate defendants at longer or greater rate for these poverty crimes, but instead to provide funds to victims for car repairs. *See* Amy Hollyfield, "Proposal would reimburse car break-in victims for shattered windows", February 12, 2020, located at: https://abc7news.com/car-breakin-san-francisco-break-in-reimbursing-victims-break-in-reimbursement/5924918/#:~:text=We%20know%20that%20San%20Francisco,said%20District%20Attorney%20Chesa%20Boudin ("I would love to support all victims of crime in

San Francisco and we are going to start with a pilot program that puts San Francisco residents first and we'll build it out from there.").

It is important to note that if Mr. Murray committed this offense on San Francisco County property as opposed to on the Park Presidio, if charged, this offense would have also been sent to YAC. Prather Decl., ¶ 11.  Upon Mr. Murray's successful completion of YAC, this case would have been dismissed and his record expunged based on the expungement already earned by Mr. Murray.  That Mr. Murray's crime is one of thousands in San Francisco militates in favor of the requested sentence.  Such a sentence accurately accounts for the seriousness of the offense, promotes respect for the law, and provides for just punishment.

### 2.   The Recommended Sentence Affords Adequate Deterrence

Empirical evidence is unanimous that no relationship exists between sentence length and general or specific deterrence, regardless of the crime type.  *See* Andrew von Hirsch, *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects.").

In April 2018, Mr. Murray was placed into custody for a month by Magistrate Judge Corley to impress an important message upon Mr. Murray.  Up to that point, Mr. Murray had wasted his life and was headed in the wrong direction.  Being in jail sobered Mr. Murray to the fact that he was now an adult who needed to take real responsibility for his actions.  When Magistrate Judge Corley released Mr. Murray to the halfway house in Oakland, he was determined to become a different person and to make good with all of the people in his life.  Thirty months have passed since was released from custody and Mr. Murray has not disappointed the Court, Pretrial Services, or his family.  As mentioned above, he

also completed a rigorous and difficult experience in YAC.  He is also employed at Sunset Youth Services as a counselor to other troubled youth.  He has righted the ship and found his calling.  The process of this case and fear of a significant sentence has provided adequate deterrence.

The recommended sentence of one-year of probation provides adequate specific and general deterrence.

## VII. REQUEST FOR A DELAYED SURRENDER DATE, IF NEEDED, IN CONSIDERATION OF THE COVID-19 HEALTH PANDEMIC

Should the Court determine that a custodial sentence is appropriate in this case, Mr. Murray requests that the Court provide Mr. Murray with a surrender date in the late Spring or early Summer of 2021.

The COVID-19 pandemic has brought the world to a halt and forever changed how we live our lives.  The virus spread rapidly around the world resulting in 60 million global cases, and 12.5 million infections and approximately 250,000 deaths in the United States alone.  Johns Hopkins University & Medicine Coronavirus Resource Center, at https://coronavirus.jhu.edu/map.html.  As of the filing of this motion, almost 19,000 people have died from COVID-19 in California.  *Id.*  COVID-19 is a highly infectious virus marked by severe and acute respiratory illness that has overwhelmed hospitals around the world and disproportionately impacts older individuals, individuals with underlying health conditions.  Once contracted, COVID-19 has a more significant effect on those individuals with the more common risk factors such as "hypertension, diabetes, high cholesterol, coronary artery disease, dementia, atrial fibrillation, chronic obstructive pulmonary disease, renal disease, cancer, and congestive heart failure."  Danny Hakim, "Asthma Is Absent Among Top Covid-19 Risk Factors, Early Data Shows," The New York Times (April 20, 2020), available at: https://www.nytimes.com/2020/04/16/health/coronavirus-asthma-risk.html.

1  COVID-19 has been demonstrated to spread rapidly where there are high concentrations of

2  people living in close proximity. Individuals held in custody at detention facilities, including jails,

3  prisons, and juvenile and immigration detention centers, are among the most vulnerable. Detention

4  facilities house dense populations in close quarters and have limited sanitation facilities and personal

5  protective equipment necessary to prevent the spread of the COVID-19 virus. Timothy Williams,

6  Benjamin Weiser & William K. Rashbaum, "'Jails Are Petri Dishes': Inmates Freed as the Virus

7  Spreads Behind Bars," The New York Times (March 31, 2020), available at:

8  https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html.   Jails and prisons in the United

9  States are already experiencing devastating outbreaks of COVID-19.

10        If placed in BOP custody or even a halfway house scenario, such action would place Mr. Murray

11  in a higher risk group for COVID-19 infection.  As such, the Court should delay any surrender date in

12  this case to a time when the risk from COVID-19 has decreased or has been mitigated.

13  ///

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

1

## VIII. CONCLUSION

2

For the foregoing reasons, namely, the Court should sentence Mr. Murray to one-year of

3

probation.  Such a sentence is an appropriate resolution to this case to both punish Mr. Murray for his

4

actions, but also to take in consideration his personal issues under 18 U.S.C. § 3553(a).  Such a sentence

5

meets the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for

6

the law, to provide just punishment for the offense, to afford adequate deterrence, and to protect the

7

public from further crimes.

8

Dated: December 9, 2020                                    Respectfully submitted,

9

10

11
*Edwin Prather*

12
EDWIN PRATHER
PRATHER LAW OFFICES

13
Attorneys for Defendant
KEVIN ALAN MURRAY

14

15

16

17

18

19

20

21

22

23

24

25